# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KEVIN A.[1],                                  Case No. 1:22-cv-307
      Plaintiff,                          Litkovitz, M.J.

vs.

COMMISSIONER OF                        **ORDER**
SOCIAL SECURITY,
      Defendant.

Plaintiff Kevin A. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for

judicial review of the final decision of the Commissioner of Social Security (Commissioner)

denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security

income (SSI).  This matter is before the Court for disposition based upon plaintiff's statement of

errors (Doc. 9), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply.

(Doc. 12).

## I.  Procedural Background

Plaintiff protectively filed his applications for DIB and SSI on October 22, 2019, alleging

disability since August 29, 2019, due to Guillain-Barre Syndrome (GBS), depression, scoliosis,

anxiety disorder, vision problems, neuropathy, flashbacks, night terrors, and nerve damage.  (Tr.

250).  The applications were denied initially and upon reconsideration.  Plaintiff, through

counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ)

Melinda Wells on April 26, 2021.  Plaintiff and a vocational expert (VE) appeared telephonically

and testified at the ALJ hearing.  (Tr. 32-53).  On May 28, 2021, the ALJ issued a decision

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

denying plaintiff's applications.  (Tr. 15-26).  The Appeals Council denied plaintiff's request for

review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A)

(DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the

work previously performed or in any other substantial gainful employment that exists in the

national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or
mental impairment – *i.e.*, an impairment that significantly limits his or her
physical or mental ability to do basic work activities – the claimant is not
disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the
listings in Appendix 1 to Subpart P of the regulations and meets the duration
requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her
past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not
disabled.  If the claimant cannot make an adjustment to other work, the claimant
is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2023.

2. [Plaintiff] has not engaged in substantial gainful activity since August 29, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. [Plaintiff] has the following severe impairments: Gillian Barre Syndrome; post-traumatic stress disorder; unspecified depressive disorder; amphetamine-type substance disorder; cannabis use disorder; and alcohol use disorder (20 CFR 404.1520(c) and 416.920(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can occasionally climb ramps and stairs, balance over uneven terrain, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds.  He can never work at

unprotected heights, drive commercially, or work around dangerous moving machinery. He can perform simple tasks in a routine workplace that involves occasional interaction with others.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. [Plaintiff] was born … [in] 1981 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from August 29, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-25).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[2] Plaintiff's past relevant work was as a handy man, a skilled, medium, but heavy as performed, position. (Tr. 24, 50).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations in the national economy such as inspector (75,000 jobs), table worker (25,000 jobs), and sorter (50,000 jobs). (Tr. 24-25, 50-51).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D. Pertinent Medical Evidence

#### 1. Treatment Records

Plaintiff was hospitalized for generalized weakness and diagnosed with Guillain-Barre Syndrome in September 2019. (Tr. 317-609). During this hospitalization, the occupational therapist noted that plaintiff expressed anxiety with sleeping and at nighttime. (Tr. 460). Plaintiff requested Valium to relieve anxiety, indicating he took the medication at home. (Tr. 488).

Plaintiff treated with neurologist Tamer Y. Abou-Elsaad, M.D., following the September 2019 hospitalization. In October 2019, plaintiff reported having difficulties with flashbacks and anxiety from his recent illness. (Tr. 315). Dr. Abou-Elsaad diagnosed plaintiff with GBS, numbness, acute generalized weakness with areflexia, intractable neuropathic pain, and depression. (Tr. 316).

On February 26, 2020, plaintiff saw Bryan Grooms, D.O., for medication refills. (Tr. 702). Plaintiff complained of neuropathy, gastroesophageal reflux, arthritis, and chronic back pain. (Tr. 703). Plaintiff also reported:

> PTSD secondary to GBS . . . Has tried to establish with counselors – mainly SMH or FRS, but has never had good results. Taking diazepam for anxiety symptoms – mostly in evenings related to Guillane [sic] Barre – states he was in hospital for several weeks, thought he was going to die. Continues to recover – "You don't know how stressful that is mentally."

(Tr. 703). Plaintiff's physical examination revealed limited ambulation, limited range of motion, abnormal deep tendon reflexes, and tenderness along the dorsal surface of his right foot. (*Id.*). However, his respiratory and cardiovascular examinations revealed no abnormalities, and his muscular strength and tone were normal with no contractures, malalignments, cyanosis, edema, or varicosities. (*Id.*). Dr. Grooms noted his mental status as "active and alert and depressed" with good judgment, insight, and memory. (*Id.*).

On April 14, 2020, plaintiff reported tingling in his right foot and chronic low back pain. (Tr. 701). Dr. Grooms noted, "Chronic pain syndrome secondary to lumbar DDD and traumatic arthropathy of right foot after crush injury, PTSD secondary to GBS . . . – overall, he is doing better." (*Id.*).

6

On April 21, 2020, plaintiff sought medication refills via a telehealth appointment with Dr. Abou-Elsaad. (Tr. 716). Dr. Abou-Elsaad advised plaintiff to continue taking gabapentin for daily episodes of "distal paresthesias in his feet and leg" that "can be moderate to severe and duration is persistent with waxing and waning features." (*Id.*). Plaintiff reported that the pain could worsen with activity or standing, but he denied suicidal ideation, severe sleep disturbance or insomnia, and took valium "as needed." (*Id.*).

Plaintiff presented to Robert E. Newman, M.D., on June 3, 2020 "to establish care and advises he is currently trying to get his medical marijuana card so he can get off the Valium [due to] the side effects." (Tr. 663). Plaintiff complained of tick bites because he "works as a[n] independent self-employed contractor" which exposed him to ticks. (*Id.*). At that visit, plaintiff denied tingling, numbness, joint pain, swelling, myalgia, anxiety, depression, difficulty sleeping, and suicidal ideation. (Tr. 664). Physical examination revealed full range of motion in all extremities, but Dr. Newman noted "wobbly gait present, unsteady when standing." (Tr. 665).

On June 19, 2020, plaintiff followed up with Dr. Newman after an emergency room visit for vomiting and abdominal pain. (Tr. 671). Plaintiff was "hoping to go into rehab for discontinuation of Norco. He is looking for a source of Valium to help with symptoms left over from [GBS]." (*Id.*). At that visit, plaintiff denied muscular weakness, tingling, numbness, joint pain, limitation of motion, back pain, anxiety, and depression. (Tr. 673). Physical examination revealed no joint or limb tenderness, edema, or ecchymosis. (Tr. 674). Plaintiff's extremities exhibited normal tone and strength with no atrophy or abnormal movements. (*Id.*). He exhibited appropriate affect, intact judgment and insight, normal mood, and "normal gait, able to stand without difficulty." (Tr. 675).

7

On June 26, 2020, plaintiff sought refills on his pain medications and valium.  (Tr. 696).

His chief complaint involved only gastrointestinal concerns.  (*Id.*).  His physical exam revealed

that he was "[a]mbulating normally" and his "muscle tone and strength [were] normal" with

"[f]ull range of motion in all extremities."  (Tr. 698).  Plaintiff reported symptoms of depression,

anxiety and sleep disturbance, but Reagan Poe, P.A., noted that on examination plaintiff was

active and alert with normal mood and affect and good judgment and insight.  (*Id.*).  Plaintiff's

July 27, 2020 visit to P.A. Poe similarly involved a "follow up" for "anxiety, refill of Valium"

with "[n]o new problems."  (Tr. 694).  Poe continued plaintiff on 5 milligrams of valium per day.

(Tr. 695).

Plaintiff presented to Dr. Abou-Elsaad on July 7, 2020, "for follow up regarding: History

of polyneuropathy and history of GBS."  (Tr. 719).  Progress notes state:

> Since his last visit, he continues to [take] gabapentin 800 mg 3 times daily.  He
> denies any side effect from such medications.  He quit taking his Percocet and
> now he is [taking] Valium 5 mg daily for recurrence of muscle spasticity.  He
> continues to have intermittent numbness and tingling in his hands and feet.
> Degree is mild to moderate and duration is minutes.  No triggers or other
> associated symptoms.  No relieving factors.  Frequency is sporadic but not daily.
> He denies any recurrent falling, weakness, neck or back pain, breathing
> difficulties or headaches.  He is able to function through his ADLs and he works
> daily.  He is trying to get license for medical marijuana to help with muscle spasm
> instead of taking Valium daily.  He has been seen by a new PCP.  No other new
> symptoms today.  Other review of system was unremarkable.

(Tr. 719).  Physical examination revealed 5/5 strength in all extremities with sensation "normal

to all modalities in both arms and decreased vibration and touch from the knees down to his

ankle.  No change."  (Tr. 720-21).  "Gait steady.  No change."  (Tr. 721).

On October 5, 2020, plaintiff saw Amber Thiel, N.P., for his medication refill.  (Tr. 683).

According to medical records from that visit:

> pt presents today for a check up and medication refill on pantoprazole, albuterol, and valium. pt states he takes valium for history of guillain barre syndrome where he had to learn how to walk and do his ADL [activities of daily living] all over again 1 year ago. he states he has muscle aches/spasms daily and the gabapentin and valium help. he states medications work well and denies any side effects.

(Tr. 685).

On March 23, 2021, plaintiff presented to Dr. Abou-Elsaad for his six month follow up regarding his history of polyneuropathy and GBS. (Tr. 767). Progress notes provide:

> Since his last visit, he continues to have intermittent dysesthesias in both arms and legs and nondermatomal pattern. He was seen recently at Clermont ED for chest pain and neck pain. He was not able to refill his gabapentin for the last several weeks. He quit taking benzodiazepine and Valium. He denies recent falling or injury. Occasional joint pain. No headache, dysphagia or dysarthria. He was diagnosed with COVID-19 2 months ago. No other new symptoms today. No other given aggravating factors. Other review of system was unremarkable.

(Tr. 767). Dr. Abou-Elsaad restarted plaintiff on gabapentin at a lower dose of 400 mg 3 times per day. (Tr. 768).

> 2. *Consultative Examiner Jessica Twehues, Psy.D.*

Dr. Twehues examined plaintiff for disability purposes on January 8, 2020. (Tr. 652). Plaintiff reported seeking disability compensation due to GBS and depression. (Tr. 652).

He described drinking alcohol heavily as a teenager after sexual abuse began around age 15, but he does not consider his current alcohol use problematic. (Tr. 653). Plaintiff reported occasional use of methamphetamine with most recent use occurring a few months prior to the examination. He stated that he uses marijuana multiple times per day and has since the age of 18. (*Id.*).

Plaintiff reported that he had never participated in counseling but had been prescribed Valium for the past five to ten years. (Tr. 654). He described his mood as angry and depressed

"most of the time" and reported feeling depressed since childhood. (*Id.*). He indicated that nightmares about past trauma keep him from sleeping well sometimes and that anxiety and health problems decrease his appetite. (Tr. 654). Plaintiff described himself as having limited energy and reduced motivation as well as a quick temper that sometimes requires that he remove himself from situations before it gets out of control. (*Id.*). He noted suffering anxiety and panic attacks when in crowds "but is generally able to relate fairly pleasantly with others in public." (*Id.*).

Plaintiff reported that he often felt paranoid or defensive at work, and he described an inconsistent work history. (Tr. 654). He claimed to have been fired from multiple jobs for "being rough" and "having a poor attitude with others," but he "struggled to elaborate further." (*Id.*). He indicated that poor physical health, depression, and anxiety made it difficult for him to work. (*Id.*).

As for activities of daily living, plaintiff spends his day caring for his wife, as she was "quite ill." (Tr. 654). He also reported completing household chores with difficulty and showering every other day. (*Id.*). He enjoys painting and drawing. (*Id.*).

Plaintiff was pleasant and cooperative with a normal gait, but he appeared to be sleeping across some chairs in the waiting room when Dr. Twehues greeted him. (Tr. 655). His speech and receptive language skills were adequate with logical, coherent, and goal-directed thoughts. (*Id.*). His vocabulary and grammatical structure suggested normal intellectual abilities. (*Id.*).

Plaintiff's mood appeared depressed, and he was tearful when speaking about his difficulties. However, his "affect seemed appropriate to content discussed." (Tr. 655). He

10

maintained good eye contact, appeared fairly relaxed, related in a calm and sensible manner, and focused well during the conversation. (*Id.*).

Dr. Twehues diagnosed plaintiff with post-traumatic stress disorder, unspecified depressive disorder, amphetamine-type substance use disorder (mild, in early full remission), cannabis use disorder (moderate to severe), and alcohol use disorder (in partial remission). (Tr. 656). Dr. Twehues opined that plaintiff would have occasional angry outbursts at work as a result of his suspiciousness of others' intensions. (Tr. 657). She also found that plaintiff would have some distractibility within a crowded setting due to high anxiety. According to Dr. Twehues, increased stress and pressure would likely make it difficult for plaintiff to focus and persist on work-related tasks, and he would have moderate to marked limitations in responding to work pressures. (*Id.*).

### 3. State Agency Review

Carl Tishler, Ph.D., reviewed plaintiff's file in January 2020, and found that plaintiff had no limitations in understanding, remembering, or applying information; moderate limitations in interacting with others and adapting or managing oneself; and mild limitations in concentrating, persistence, or maintaining pace. (Tr. 57). Dr. Tishler opined that plaintiff appears capable of work in a relatively static setting with no strict time or production demands and with "only limited and infrequent interaction [with] coworkers, supervisors, and the general public." (Tr. 62-63).

Deryck Richardson, Ph.D., reviewed plaintiff's file upon reconsideration in June 2020 and affirmed Dr. Tishler's assessment, except he found that plaintiff had moderate limitations in concentrating, persistence, or maintaining pace. (Tr. 80). Dr. Richardson also concluded that

11

plaintiff was capable of work in a relatively static setting with no strict time or production demands and with only limited and infrequent interaction with coworkers, supervisors, and the general public. (Tr. 84-85).

### E. Specific Errors

On appeal, plaintiff raises two assignments of error: (1) the ALJ failed to appropriately assess the opinion evidence and/or develop the record with a mental health opinion; and (2) the ALJ has not provided substantial evidence for rejecting plaintiff's subjective report of symptoms. (Docs. 9 and 12). The Commissioner counters that substantial evidence - including objective evidence in the treatment record, plaintiff's reported daily living activities, the consultative examiner's findings, and the state agency consultants' findings - supports the ALJ's determination that plaintiff was not disabled and retained the residual functional capacity (RFC) for a reduced range of sedentary work.

> 1. *The ALJ's Evaluation of the Medical Opinion Evidence is Supported by Substantial Evidence.*

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions. *See* 20 C.F.R. § 404.1520c (2017) and 20 C.F.R. § 416.920c; *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to such opinions.[4] *Id.* The Commissioner will "not defer or give any specific

---

[4] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "The

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s)[5], including those from your medical sources."  20 C.F.R. §

404.1520c(a); 20 C.F.R. § 416.920c(a).  Rather, the Commissioner will consider "how

persuasive" the medical opinion is.  20 C.F.R. § 404.1520c(b); 20 C.F.R. § 416.920c(b).[6]

In determining the persuasiveness of a medical opinion, the ALJ considers five factors:

(1) supportability, (2) consistency, (3) relationship with the claimant, including length of

treatment relationship, frequency of examinations, purpose of the treatment relationship, and

examining relationship, (4) specialization, and (5) other factors that tend to support or contradict

a medical opinion.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors the ALJ must

consider are supportability and consistency.  20 C.F.R. § 416.920c(b)(2).  With respect to the

supportability factor, "[t]he more relevant the objective medical evidence[7] and supporting

explanations presented by a medical source are to support his or her medical opinion(s) . . . the

more persuasive the medical opinions . . . will be."  20 C.F.R. § 416.920c(c)(1).  Similarly, "[t]he

---

Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[5] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim."  82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.  For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians and psychologists as "assessments" or "opinions."

[6] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical." *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *1 n. 1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  For claims filed on or after March 27, 2017, these regulations are found at 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c, respectively.  The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations, and vice versa, for purposes of this Order.

[7] Objective medical evidence is defined as "signs, laboratory findings, or both."  82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 416.920c(c)(2). The ALJ is required to "explain how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 416.920c(b)(2). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

Plaintiff contends that the ALJ inappropriately rejected all three mental health opinions in the record without offering sufficient reasons for finding fewer limitations than those opined by the mental health professionals. (Doc. 9 at PAGEID 813). The ALJ provided the following reasons for finding the opinions of the state agency consultants (Drs. Tischler and Richardson) and the consultative examiner (Dr. Twehues) not persuasive: (1) all three opinions are inconsistent with plaintiff's treatment history (Tr. 23); (2) all three opinions are unsupported by the medical record because plaintiff's medical treatment providers noted few mental status abnormalities, "with treatment notes beginning in June 2020 showing no noted mental status abnormalities" (Tr. 23); and (3) the opinion of Dr. Twehues is vague and based on subjective complaints rather than her own objective findings (Tr. 23). The ALJ's evaluation of the medical opinion evidence is supported by substantial evidence.

14

First, the ALJ found the mental health opinions "not persuasive" – in part – because they were inconsistent with plaintiff's treatment history. (Tr. 23). Specifically, the ALJ noted that, other than a medication prescription from his primary care physician, plaintiff neither sought nor received mental health treatment.[8] (*Id.*). As previously explained by this Court:

> While failure to seek or engage in mental health treatment does not necessarily "evidence a tranquil mental state . . . [a] reasonable mind might find that the lack of treatment could indicate an alleviation of symptoms." *Cole v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 738, 743 (E.D. Mich. 2015) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009)) (internal quotation marks omitted); *see also Esch v. Comm'r of Soc. Sec.*, No. 1:09-CV-144, 2010 WL 432265, at *5 (W.D. Mich. Jan. 25, 2010) (stating the "general rule that a claimant's failure to seek treatment over an extended time period undercuts the claimant's assertion that his impairment is disabling").

*Rowland v. Comm'r of Soc. Sec.*, No. 2:16-cv-481, 2017 WL 1190541, at *8 (S.D. Ohio Mar. 31, 2017), *report and recommendation adopted*, 2017 WL 2644210 (S.D. Ohio June 19, 2017). Where, as here, plaintiff routinely secured medical treatment for his other impairments, the ALJ appropriately considered plaintiff's failure to seek mental health treatment as part of her consistency analysis.

Plaintiff contends that the ALJ should not have cited plaintiff's lack of mental health treatment without considering "why this might be the case." (Doc. 9 at PAGEID 816). Plaintiff argues that he "tried to establish with counselors, but had never had good results." (*Id.* (citing Tr. 703)). The treatment record on which plaintiff relies states:

> PTSD secondary to GBS – states over the past several months, he has been working with prior PCP to wean off narcotics. Started several years ago after injury and has been on ever since – states he was on Suboxone a couple of years ago, but that it is worse than opioids. Feels dependent on narcotics – has had withdraw effects in the past. Has tried to establish with counselors – mainly SMH

---

[8] Plaintiff's medical records contain a reference to a psychiatric hospitalization in 2009 or 2010. (Tr. 654). Neither party raises that hospitalization in support of plaintiff's claimed disability beginning August 29, 2019.

> or FRS, but has never had good results. Taking diazepam for anxiety symptoms –
> mostly in evenings related to Guilliane [sic] Barre – states he was in hospital for
> several weeks, thought he was going to die. Continues to recover – "You don't
> know how stressful that is mentally."

(Tr. 703). It is not clear from this note whether plaintiff was referring to mental health treatment

or addiction counseling. In addition, plaintiff reported to the consultative examiner that "he has

never participated in mental health counseling." (Tr. 654). Accordingly, the ALJ reasonably

considered plaintiff's failure to seek mental health treatment beyond prescription medication in

determining whether the consultants' opinions were consistent with other medical and

nonmedical evidence.

Second, the ALJ found all three mental health opinions inconsistent with the medical

record because plaintiff's medical treatment providers noted few mental status abnormalities.

(Tr. 23). The ALJ's conclusion that plaintiff was found to have few mental status abnormalities,

particularly after June 2020 (Tr. 23), is supported by substantial evidence.

Medical records from February 2020 indicate good judgment and insight with "active and

alert and depressed" mental status and normal recent and remote memory. (Tr. 703). In June

2020, plaintiff sought medical treatment at a hospital emergency room for abdominal pain and

vomiting. (Tr. 736). During that visit, medical records report that plaintiff was "negative for

agitation and confusion," "alert and oriented" with "normal" behavior. (Tr. 736-37). July 2020

medical records include plaintiff's self-report that he "is able to function through his ADLs

[activities of daily living] and he works daily." (Tr. 719). His July 2020 medical examination

revealed normal attention span and concentration; intact remote and immediate recall; oriented to

16

person, place, problem, and time; language fluency; and good fund of knowledge.  (Tr. 720).  In October 2020, the nurse practitioner noted that his medications worked well with no side effects. (Tr. 685).  His report of symptoms at that time included depression, anxiety, insomnia and stress without loss of interest, but the medical examination revealed good judgment; normal mood and affect; orientation to time, place, and person; and normal remote and recent memory.  (Tr. 686). March 2021 medical records indicate that plaintiff "quit taking benzodiazepine and Valium." (Tr. 767).  Plaintiff's mental status exam reflected that he was oriented to person, place, problem, and time.  Plaintiff also exhibited good immediate and remote memory; normal attention span and concentration; intact language fluency; and a good fund of knowledge.  (Tr. 768).  Plaintiff's psychiatric systems review was "unremarkable."  (Tr. 768).

Plaintiff accurately argues that some medical records in 2020 noted psychiatric complaints.[9]  (Doc. 9 at PAGEID 816).  However, it is not the province of the Court to reweigh the evidence.  "Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached."  *Livingston v. Comm'r of Soc. Sec.*, 776 F. App'x 897, 898 (6th Cir. 2019) (alteration in original) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)).  The evidence here reasonably supports the ALJ's conclusion that plaintiff's medical treatment providers noted few mental status abnormalities, particularly after June 2020.

---

[9] For example, in refilling his valium prescription in July 2020, the physician assistant noted, "Posttraumatic stress disorder – Onset 6/26/2020;" "Follow up anxiety, refill of Valium. No new problems;" and depression, sleep disturbances, anxiety without hallucinations, suicidal thoughts, mood swings, or memory loss.  (Tr. 693-94, 698). The physician assistant also reported, "Psychiatric: good judgement and insight. Active, alert, normal mood and affect. Oriented to time, place and person. Recent and remote memory normal."  (Tr. 695, 698).  The physician refilled plaintiff's prescription for 5 mg of valium twice per day.

17

Third, the ALJ found Dr. Twehus' opinion not persuasive as vague and based on subjective complaints rather than her own objective findings.  (Tr. 23).  Dr. Twehues assessed plaintiff as "likely to experience increased distractibility within a crowded setting due to high anxiety," but during her interview plaintiff "seemed to track conversation relevantly and did not appear easily distracted."  (Tr. 657).  Dr. Twehues indicated that plaintiff reported that "he loses his temper quickly with family but generally relates well with others outside of his family" and "presented as pleasant and cooperative in interactions with this evaluator," but she assessed that she "would expect at least occasional angry outbursts at work" and "may at times present as agitated."  (*Id.*).

Plaintiff admits that the ALJ's vagueness finding "has a kernel of truth to it," (Doc. 9 at PAGEID 817), but argues that "tellingly, the ALJ did not take issue with the non-examining opinions' use of the phrase 'appears capable of' combined with 'moderate' limitations."  (*Id.* (citing to Dr. Richardson's report)).  However, the ALJ similarly found Dr. Richardson's and Dr. Tischler's opinions "not persuasive."  (Tr. 23).  In addition, Dr. Twehues' conclusions are, indeed, based solely on plaintiff's self-reported issues rather than any assessment she completed. And, finally, the ALJ did not err by rejecting Dr. Twehues' assessment based on the vague nature of her conclusions.  *See Hutchinson v. Comm'r of Soc. Sec.*, No. 1:18-cv-761, 2020 WL 2519709, at *13 (S.D. Ohio May 18, 2020), *report and recommendation adopted*, 2020 WL 3288411 (S.D. Ohio June 18, 2020) (finding that substantial evidence supported ALJ's discounting of Dr. Twehues' opinion based on the vague nature of her conclusions and because she did not assess specific limitations).  The ALJ provided valid reasons for discounting Dr.

18

Twehues' opinion, and the ALJ's assessment of Dr. Twehues' opinion is supported by substantial evidence. Plaintiff's first assignment of error is overruled.

### 2. *The ALJ Was Not Required to Further Develop the Record.*

Plaintiff next contends that the ALJ should have further developed the record because she found unpersuasive the opinions of the state agency consultants and the consultative examiner. (Doc. 9 at PAGEID 818-19). However, as the Sixth Circuit recently reiterated:

> Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate. *See Sims v. Apfel*, 530 U.S. 103, 110–11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (plurality opinion) ("Social Security proceedings are inquisitorial rather than adversarial."); *Richardson v. Perales*, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("The [ALJ], furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."). So while the ALJ must ensure that every claimant receives "a full and fair hearing," *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986), the ultimate burden of proving entitlement to benefits lies with the claimant, 20 C.F.R. § 404.1512(a).

*Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023). There may be a heightened duty to develop the record if plaintiff were "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures. . . ." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley v. Sec'y of Health & Human Serv.*, 708 F.2d 1048, 1051 (6th Cir. 1983)); *cf. Moats*, 42 F.4th at 566 (Readler, J., concurring) ("*Lashley*'s 'heightened duty' language, in other words, is a textbook example of an interpretive practice that has long fallen out of favor").

In this case, plaintiff has been represented by counsel since filing his application (Tr. 96), and he was represented by counsel during the hearing before the ALJ (Tr. 35). There is no

allegation that plaintiff's counsel did not represent him ably, and plaintiff has identified no evidence counsel should have submitted in support of his claim.

Plaintiff contends that the ALJ, having found the mental health opinions unpersuasive, must further develop the record before forming an RFC "without the assistance of a current medical source." (Doc. 9 at PAGEID 818). However, the case on which plaintiff relies for his contention states:

> Indeed, "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (quoting *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). Yet, "[t]here are limited occasions where the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a current medical source." *Shelley v. Comm'r of Soc. Sec.* No. 2:18-CV-676, 2019 WL 4023551, at *8 (S.D. Ohio Aug. 26, 2019 (Jolson, M.J.)) (citation omitted).

*Jones v. Comm'r of Soc. Sec. Admin.*, No. 3:19-cv-142, 2021 WL 843100, at *6 (S.D. Ohio Mar. 5, 2021). That language does not apply here. The ALJ had the benefit of numerous medical sources, and she relied on those sources to find unpersuasive the state agency mental health opinions. (Tr. 23).

Even if the ALJ lacked medical sources, "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). Rather, the ALJ's RFC determination must be supported by substantial evidence. *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020).

20

Contrary to plaintiff's argument, the ALJ is not required to base the RFC determination on a medical opinion. The Sixth Circuit previously addressed this issue as follows:

> [The plaintiff] contends that once the ALJ decided to give no weight to the physicians' opinions regarding his ability to work, the ALJ was required to get the opinion of another physician before setting the residual functional capacity. We disagree. We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work"); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the same argument because "the ALJ is charged with the responsibility of determining the [residual functional capacity] based on her evaluation of the medical and non-medical evidence"). We similarly find no error here. The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions.

*Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018). "[T]o require the ALJ to base her RFC on a physician's opinion would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability." *Rudd*, 531 F. App'x at 728.

In this case, the ALJ found all three mental health opinions unpersuasive. As explained above, the ALJ's conclusion was supported by substantial evidence. Accordingly, the ALJ was not required to further develop the record in this case.

3. *The ALJ's Evaluation of Plaintiff's Symptom Severity and Corresponding Residual Functional Capacity (RFC) Finding are Supported by Substantial Evidence.*

ALJs are to "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including

21

pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the individual's record."  SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016) (rescinding and superseding SSR 96-7p).  ALJs also evaluate what the agency formerly termed the "credibility" of a plaintiff's statements about his or her symptoms.  *See, e.g.*, *Rogers*, 486 F.3d at 246-49.  In March 2016, the agency eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character. . . ."  SSR 16-3p, 2016 WL 1119029, at *1 (March 16, 2016) (rescinding and superseding SSR 96-7p).  To avoid such mistaken emphasis, this analysis is now characterized as the "consistency" of a claimant's subjective description of symptoms with the record.  *See Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

A two-step inquiry applies to symptom evaluation.  The ALJ first determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms.  SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003).  Step two of symptom evaluation shifts to the severity of a claimant's symptoms.  The ALJ must consider the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.  *See* 20 C.F.R. §§ 404.1529(a) and (c); SSR16-3p, 2016 WL 1119029, at *4.  In making this determination, the ALJ will consider the following:

(i)     Your daily activities;

(ii)    The location, duration, frequency, and intensity of your pain or other

symptoms;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)    Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)    Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)    Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability. SSR 16-3p, 2016 WL 1119029, at *5 ("If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms."); 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Moreover,

[i]t is . . . not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *9. *See also id.* at *7 (noting that the ALJ "will discuss the factors pertinent to the evidence of record").

At the same time, the ALJ is not required to cite or discuss every factor used to evaluate the consistency of a plaintiff's description of symptoms with the record evidence. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered [the predecessor to SSR 16-3p], which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so. This claim therefore lacks merit. . . ."). Further, the ALJ's determination regarding the consistency of a claimant's subjective complaints with the record evidence is "to be accorded great weight and deference. . . ." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of H.H.S.*, 818 F.2d 461, 463 (6th Cir. 1987)).[10]

Plaintiff contends that the ALJ has not provided substantial evidence for his rejection of plaintiff's subjective report of symptoms. (Doc. 9 at PAGEID 819-21). Plaintiff first argues that the ALJ improperly stated that plaintiff's GBS symptoms "improved within one year of onset" even though medical records indicate that plaintiff continued to suffer decreased sensation from knees to ankles and intermittent numbness or tingling in his hands and feet. (*Id.* at PAGEID 819-20). Plaintiff correctly notes that medical records show some of his GBS symptoms continuing more than a year after his August 2019 diagnosis. On July 7, 2020, Dr. Abou-Elsaad

---

[10] The *Walters* court noted that substantial deference was appropriate due in large part to an ALJ's unique observation of a witness's "demeanor and credibility." With the elimination of the term "credibility" in SSR 16-3p, it is questionable whether an ALJ's observations should be given any deference. At least one Sixth Circuit decision subsequent to the enactment of SSR 16-3p, however, has retained the notion of deference to the ALJ in the symptom-consistency context. *See, e.g., Lipanye*, 802 F. App'x at 171 ("It is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements.").

noted recurring muscle spasticity; intermittent numbness and tingling in his hands and feet of
"mild to moderate" degree, lasting for "minutes," of "sporadic" frequency "but not daily." (Tr.
719). Dr. Abou-Elsaad further noted that plaintiff denied recurrent falling, weakness, neck or
back pain, breathing difficulties or headaches; was "able to function through his ADLs"; and
work daily. (*Id.*). In contrast, during his 2019 hospitalization for GBS, plaintiff "presented with
rapidly progressing generalized weakness to the point that he could no longer walk" and
polyneuropathy. (Tr. 321). At that time, plaintiff went from a pre-GBS level of "independent"
functioning to a "max assist" level of function. (*Id.*). He was admitted to the hospital for five
days of treatment before transferring for two weeks of inpatient rehabilitation. (Tr. 633). Thus,
the ALJ's statement that plaintiff's symptoms improved within a year of diagnosis is supported
by the medical records. The ALJ did not find that plaintiff had no remaining symptoms of GBS.
Indeed, she found an RFC of sedentary work with only occasional climbing of ramps or stairs;
occasional balancing over uneven terrain; occasional stooping, kneeling, crouching, and
crawling; never climbing ladders, ropes, or scaffolds; never working at unprotected heights;
never driving commercially; and never working around dangerous moving machinery, in an
effort to accommodate plaintiff's remaining difficulties. (Tr. 19).

Second, plaintiff contends that the ALJ should have evaluated the reason plaintiff failed
to pursue mental health treatment before finding that plaintiff's statements concerning the
intensity, persistence and limiting effects of his mental health symptoms were not entirely
consistent with his lack of mental health treatment. According to plaintiff, the ALJ's failure to
do so violates SSR 16-3p. (Doc. 9 at PAGEID 820-21). SSR 16-3p states in relevant part:

25

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We **may** need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following: . . . An individual's symptoms may not be severe enough to prompt him or her to seek treatment, or the symptoms may be relieved with over the counter medications.

SSR 16-3p, 2017 WL 5180304, at *9-10) (emphasis added).

In this case, the ALJ cited plaintiff's failure to pursue mental health treatment as one of many reasons she found his statements concerning the severity of his mental health limitations not entirely consistent with the medical evidence and other evidence in the record. (Tr. 20). For example, the ALJ cited also to multiple medical records indicating that plaintiff exhibited few mental status abnormalities and that the GBS symptoms causing some of plaintiff's increased anxiety and depression improved over time. (Tr. 22-23). In addition, plaintiff reported that he was able to help care for his ailing wife, tend to household pets, perform some household chores, drive, and enjoy a painting exercise on an electronic device. (Tr. 22, 37). Thus, the ALJ did not discount plaintiff's symptom severity based solely on his failure to seek treatment.

In addition, plaintiff argues that he failed to seek mental health treatment because past efforts proved unsuccessful. (Doc. 9 at PAGEID 820). However, plaintiff's contention lacks evidentiary support. Plaintiff himself reported to the consultative examiner that he had "never participated in mental health counseling." (Tr. 654). Plaintiff testified at the hearing that he no

longer takes medication for anxiety or depression, has not been hospitalized for depression or anxiety in more than 10 years, and does not go to counseling.  (Tr. 42-43).  He found visits from church friends sufficient "private counseling."  (Tr. 43).  He testified that he loved animals and that his Siberian Huskies were "good for depression and anxiety."  (Tr. 48).  Therefore, the ALJ had no obligation to further investigate the reasons plaintiff did not seek formal mental health treatment because he specifically testified that his church friends and his dogs served as his mental health treatment.

Finally, plaintiff argues that the ALJ's limitation to "occasional interaction with others" contradicts the state agency consultants' recommendation of "limited and infrequent interaction" with coworkers, supervisors, and the general public.  (Doc. 9 at PAGEID 817; Doc. 12 at PAGEID 847).  The ALJ's RFC for "occasional interaction" is supported by substantial evidence.

SSR 83-10 specifically defines "occasionally" as "occurring from very little up to one-third of the time."  SSR 83-10 (S.S.A.), 1983-1991 Soc. Sec. Rep. Serv. 24, 1983 WL 31251, at *5.  "Frequent" is defined as "occurring from one-third to two-thirds of the time."  *Id.* at *6.  "Infrequent" interaction, then, means interaction occurring less than one-third of the time.  Thus, in this context, "infrequent" interaction is synonymous with the "occasional" interaction to which the ALJ limited plaintiff.

Plaintiff cites no authority for his argument that "occasional interaction" and "limited and infrequent interaction" are contradictory terms.  (Doc. 9 at PAGEID 817-18; Doc. 12 at PAGEID 847).  In addition, even if those terms conflict, the ALJ had no obligation to incorporate the "limited and infrequent interaction" limitation into the RFC finding.  *Poe v. Comm'r of Soc. Sec.*,

27

342 F. App'x 149, 157 (6th Cir. 2009) (An ALJ is "not required to recite the medical opinion of a physician verbatim in h[er] [RFC] finding."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would . . . [abdicate] the Commissioner's statutory responsibility to determine whether an individual is disabled.'") (quoting Social Security Ruling (SSR) 96-5p, 1996 WL 374183, at *2). The ALJ provided reasons for finding the mental health opinions not persuasive, and the Court determined above that those reasons are supported by substantial evidence.  Plaintiff's second assignment of error is overruled.

## IT IS THEREFORE ORDERED THAT:

1.      Based on the foregoing, plaintiff's statement of errors (Doc. 9) is **OVERRULED**;

2.      The Commissioner's non-disability finding is **AFFIRMED**;

3.      Judgment is entered in favor of the Commissioner; and

4.      This case is **CLOSED** on the Court's docket.

Date:   7/14/2023

Karen L. Litkovitz
Chief United States Magistrate Judge

28